Well, good morning and welcome to the Ninth Circuit. I'm Judge Nelson and it's a pleasure to be joined by Judge Hawkins and Judge Clifton. We want to welcome counsel and we're grateful to our court staff who has consistently made it convenient for us in another week without any hiccups. We ask that during our argument just pay attention to your time, let us know if you want to reserve time for rebuttal, and then sum up as the time's expiring. And we've got two cases set for argument. We've submitted some others. Luxton v. Washington State Department of Veteran Affairs, case number 25-3542. And Mr. McLaughlin, I think. Thank you, your honor. Good morning, your honors. May I please the court. My name is Dennis McLaughlin. I'm with the Western Washington Law Group and I represent Dr. David Luxton, who's also a major in the Air Guard and the Civil Air Patrol. We're asking this court today to reverse the, vacate the decision by the district court that granted summary judgment in favor of the Washington Department of Veterans Affairs. And to reverse this and to remand it back to them, to the court, with the instructions to enter a partial summary judgment in favor of the plaintiff, or the appellant in this case, and to have proceedings on just a few issues. And that's the first thing I'd like to clear up for you is to say why this case is different and how we're gonna expedite and clean up some of the causes. The biggest issue is is Title VII, right? The biggest, the biggest. In fact, that's the only merits issue, isn't it? That's the has the federal gravitas to send it back. A lot of the constitutional claims, I think, are not going to be, they shouldn't, they shouldn't be raised. The only ones were going to... On appeal they shouldn't be raised? Well... You didn't raise, I thought it was only Title VII. Well, it was that and the technical dismissal of the of the federal claims because they named the agency and not the individual director. That's the other issue. And so we're asking that... They did name the agency and not the individual, right? Yeah, they named the agency, which they shouldn't have done, and not the individual, but the agency got the notice, and under Kentucky v. Graham, that's the important part. They're the real party in interest on the official capacity suit. Well, yeah, the law is pretty clear that you can't sue the state. Oh, I agree. And at what point was there a request to amend that? Oh, it was in the response to the summary judgment. Which is well after the time when the discovery was amended. Oh, I agree that, I agree, I agree with your honors, but at the same point, I do look at the liberality of amendments, even if they're not requested, just as... Yeah, but we have to find abuse of discretion, and that's a tall order. I mean, what, are there cases that say that it's an abuse of discretion to deny amendment after discovery closes through an improper vehicle? What's your best case for that? Well, I think Bacon v. Woodward, your honor, to be honest with you, I'm so... Yeah, everybody loves that case, at least when I'm on the panel. Well, you know, you know, that's, to be honest with you, to be honest with you, that one is cited for that proposition more than any other one. Even if they're, even if the, even if it's not requested, courts should look at it. And if you think about it, we should allow trials on the merits, and that's why I want to focus... Yeah, but I mean, counsel, and I don't, honestly, I'd have to go back and look at Bacon on the specific issue, but discovery closes, you do it in a summary judgment motion, like we've got to have some normalcy here, or else we're gonna drag these things... I mean, you're talking about reopening, fine, go to trial, if you can get to trial, but don't extend it another two years once you're ready to go to trial. And I'm not suggesting that, that's what I want to talk about, Your Honor, is because... You don't think more discovery will be required? It shouldn't, it shouldn't be, and here's the reason why there's no prejudice, because the agency, which is the real party in interest, if you name a person in their official capacity... You're undoing decades of law by saying, well, it really doesn't matter, we can name the state and we'll just convert it later. That, is there a case that holds that proposition? No, the only thing I can tell you... Maybe we should get to the merits? Yeah. I think this... Okay, let me, but let me just get to the merits, because this is why this case is different. So, okay, go ahead. All right, let me, let me get to why this case is different. First of all, this is not, Dr. Luxton is not a first responder. He, there's a disputed issue of fact as to what his truly essential job functions were, and what... Who do we look to, to define the job function? The employee who's had the job for a little more than a month, or the employer trying to anticipate what the needs of that position that they've hired are. I mean, the description talks about site visits. The description talks about in-person meetings. That, that's true, Your Honor, but in this case, that's, that's one of the peculiar parts of this case. Dr. Luxton, as he laid out about his experience, he is the telehealth psychologist. He's the one who brought telehealth. He's, his unit was the first to bring telehealth to Army veterans. He was the one who brought telehealth for the Trueblood and the DS, DSHS. He was the guy who got that started, so they could do the remote evaluations. He got hired on here to be the guy who is going to coordinate telehealth. And that doesn't mean that the job is exclusively telehealth. The job description requires site visits. It requires site inspections, but as he said in his declaration... What he used in the description is site visits. Right. That's what it says. It's there, isn't it? July 1st, 2011 version of that job description does say site visits. Well, you act as if the July version might not be the, I mean, isn't that what we looked at? Well, we're talking about reasonable accommodations too, your honor. Okay. So that's where I wanted to go because the district court ruled on both issues and the district court said they offered to reassign. They told him how to apply for reassignment and he never did it. They didn't offer him a reassignment, your honor. Well, they told him he would be eligible for reassignment. Now I understand that this is murky because the, you know, the facts aren't exactly detailed here, but they told him you could apply for reassignment, do it within seven days, and he didn't do that. So why isn't that, I mean, that doesn't sound like a... I believe your argument is going to be it was futile and everything suggested it would have been futile to apply for reassignment. That's one argument, but there's even a better argument in my opinion. And it's got to be that in September 14th, before he went on medical leave, he asked them what the accommodation policy is. They sent him the medical accommodation policy saying we don't have one for religion, we're using this one. They sent that again to him on October 6th. That policy says it's your appointing authority that makes the determination regarding accommodations. He had that conversation with his appointing authority on October 5th, right after he got the notice. And she said there's nothing that can be done, the decision's made, I'm posting your job. Whoa, whoa, whoa, wait a second. I don't... Is that exactly what was said? I had understood what she said is I don't have anything to do with the reassignment. No, that's not at all. She said the decision's already been made and I'm posting your job. That's why she called him, is to give him the heads up that she is posting his job. That's not what I recall either. So where in the record is, is it articulated the way you just said? It's in Dr. Luxton's declaration. And in fact, there's a whole, there's a whole litany of him saying that decision's already been made. I had nothing... I think you're, okay, so we might be talking past each other. Because I think it is true that they said we cannot accommodate you in your current job as unvaccinated. But then they said you can apply for a reassignment. And so we've got all this case law that says, well, reassignment can be okay in certain circumstances. Well, here we don't know because he never applied. They said, here's, apply, seek reassignment by sending a letter or an email, had to email a contact at Human Resources, Mrs. Dretcher, no later than seven days from the date of this notice. And he didn't do that. That's undisputed, right? He did not do that. But if you let me, I want to pull his declaration so we get the exact language of what his testimony was as to his conversation with Col. Forbes. You can, except that my point is, I'm not sure it matters. Because the question, it seems to me, for reasonable accommodation is, they had made a determination that he couldn't do his current job remotely. I think you're gonna come up with a declaration that says he heard that. And I don't think there's a disagreement on that. The question is, is reassignment a reasonable accommodation? Okay, let me answer that first. First of all, by just saying he definitely disagrees that he couldn't be accommodated in his current job. And he bases that on three things. I want to be, that's the first point of contention. That's what separates this case from a lot of the other cases that you've heard. I watched you on Tuesday, obviously, and I know that you've got a lot of these cases churning through. This one is different. He does testify and, you know, Judge Hawkins makes a good point. You know, why should we listen to the guy who's been on the job for five or six weeks, as opposed to the, at that time, the assistant director, now director? I understand that. But that goes to the weight of the evidence. He definitely says he could do the job 100%. As he defines the job. But the job description, among other things, calls for site visits. You don't do that by telemedicine. Right, but you understand that in March of 2020, the governor ordered everyone to stay home. Oh yeah, I mean, and we stayed home. Right. I went months having oral arguments wearing shorts and no long pants. I bet you liked that. The good thing of being in Hawaii, I could do that. Not shoes either. But that was the time. And as developments unfolded, things that were done at home could be done on site and on site was preferable. So we are here now. And we came back as soon as our judgment said we could. I don't understand how he's supposed to be the person who can define what his job requires when it's purely a matter of, I mean, it's clearly the employer who thinks that site visits are supposed to be part of the job. Indeed, the site visit language comes from saying it's the primary of making contact, primary way of making contact and supervising the counselors and so forth. And a department that has lost a good number of residents of those veterans homes to COVID. So they're trying to figure out how to deal with these two things. And for you to tell me that he thinks he can do it entirely remotely, but the department doesn't, I'm not sure why it is we're supposed to listen to his preferred route if the department thinks the job needs to be done at least partially in person. Thank you, Your Honor. I agree. And you make, you make, you make, you kind of make my point if I, and I don't really. I look forward to hearing how. So if I ask a question, it's rhetorical, okay? So if you have a religious conviction that it makes you opposed to taking the COVID-19 vaccine. In this case, it was admitted in the meetings that he had a sincerely held religious belief that he, he was given a religious exemption. That's not an issue here. Right. So, so you, you said, well, we came back when our judgment told us that it was okay to come back. And you know, the requirement was in order for you to come back, you had to have a primary series of the COVID-19 vaccine. Okay. He, for religious reasons, was opposed to getting the COVID vaccine because of the, his religious beliefs and their sincerely held. So the question is, did the department have a duty to accommodate that? And the answer is if they'd been accommodating it since March of 20. Not a dispute that, that they did. The question is, does doing so impose undue hardship? Well, the, first of all, all exemptions, whether they're medical or whether they're religious, according to the OFM guidelines, which they followed was only good for 60 days. So he was only asking for a 60 day exempt and see where we're at then see what, see what the situation is. It was, it's not a permanent deal. He certainly could be doing it now. It was just a short term. It was short term to see what was happening. That's what we were all doing back then. We were seeing what was happening because I didn't leave the house. I was scared. You were scared. Everybody was in uncertainty. And so was the department. And if you have a religious conviction on that job requirement, it is our contention that you have to accommodate religion. Well, so I don't, nobody I think disagrees with you. That's what you're just restating the law. But of course, as you know, the devil's in the details. And the question I have is when they said we can reassign you and he doesn't apply for the reassignment, why does he then get to come in and say, well, you didn't reasonably accommodate me? Well, they don't know. I mean, we assume that we assume there's a lot of like anecdotal evidence that maybe they couldn't reassign him, but he never applied for it. And why can't we set a law or a rule that says, look, when they say we might be able to reassign you, you got to go through the process. We do that with a whole series of, I mean, prisoners, we tell them that you got to exhaust the administrative requirements. Why can't we tell religious objectors you got to do the same thing? And maybe you're right. Maybe they couldn't have accommodated him. And then you might have had a claim, but you didn't email HR. That's not a big burden. You didn't email HR. You didn't put in your resume. And that was what they told you to do. Thank you, Your Honor. I'd like to just challenge you just a little bit on that. He just got hired in September. They had his resume. That wasn't they did. OK, that was that. That is a technical way. He's fighting this. He did email HR and ask for a reassignment. He emailed. Well, it's not. Oh, he didn't. Well, it says it's if you read the answer is no, he didn't. No, he did. But he asked his but he asked his appointing authority. That's not what they told him to do. But and his appointed authority said, I don't make the decision on reassignment. No, that's but but that's what they gave him a written policy that says she is the person who makes the final decision. That's what I'm trying to say. We'll look at that. But I assume what it says is showing you're assuming that if he had applied, the request for accommodation would have been denied. Your Honor, they didn't accommodate one exemptor, not one exemption, not one of them. Nobody. How many are we talking about? Twenty nine. Not one person was accommodated. Zero accommodated for the job that they're in or for other potential jobs. The way the system worked, according to the letter that was written, was. You can apply and you can't get a promotion. You have to stay at your level or lower, but it's any available job. Sit within the department and then then it goes statewide. Did he ever assert in the record that the reason he did apply for accommodation was that that would be futile? He did assert that he went to his both on September 14th when he asked for the policy and again from H.R. They sent him the policy on October 6th and the policy clearly states that the appointing authority is the person that makes the final determination as to any accommodation. He went to his appointing authority to request an accommodation and she said the decision's already been made. I'm posting your job, but the answer is no. So there's two decisions. One decision is, can you stay in your job? And the other is, can you be reassigned? Well, no, that's that. That's that's where that's the crux of this. You're saying, no, I don't want reassignment. That's not a reasonable accommodation. No, well, you know, you're saying that they should have let him stay in his job and not say that. OK, I'm sorry, your honor. That's why I wanted to sit earlier in the argument. Well, I'm saying I'm saying a first of first under the 29 CFR 16052, which is really important. It says that you try. You have to see if you can accommodate them in their in their initial position. And then if you can't, you consider reassignment to a lateral. And you're citing to us a statement you cited more than once. I'm posting your position. They have concluded that his inability to be available in person, at least in times, did not present an accommodation in his current position. That's not the same as saying. By contacting H.R. or doing something else, I seek moving to a different position that I can do remotely. And so we have another example of ships passing in the night. I don't hear something that says. I seek reassignment as distinguished from I want my existing job. OK, let me let me let me be real clear about how the declarations work, because this is going to this is this is now turning out to be a very, very crucial issue. He filed the declaration in support of his motion for summary judgment. And it says I talked to Colonel Forbes, which is the appointing authority. Right. And I said about what is there any kind of accommodation? I want to stay here. I want to stay working here, including reassignment. And the judge, that's not the person to whom the question is supposed to be directed, but it is an official within the agency. But it is according to their written policy. He got a letter that said email H.R. But he also got a written policy that says this is what you need to follow that says that you got the appointing authority has the final determination. That's what I'm trying. That's what I'm that's. And he got that on September 14th, saying this is the policy we're following. He got it again from H.R. on October 6th in response to the email he sent them on October 5th. He got the same policy. And so he's talking to the appointing authority and he says, I want to talk about accommodations, including reassignment. No, I think that's the question. And that's why I'm trying to pull this up, because I don't know why he's talking about reassignment to his supervisor. Why would his supervisor know about reassignment? Because she's the one who makes the ultimate. According to the policy. Come on, counsel, you've got to be the supervisor has no idea whether he can be reassigned somewhere else. The supervisor knows whether he can be accommodated in the job he's serving in. That may be true, but I I'm sorry, you're just you're being a little bit obstinate in answering the questions here. He should have gone to H.R. and he didn't just acknowledge that. If in hindsight, that is obviously true, your honor. I'm not I'm not trying to pick a fight with you, but I am saying that when you look at the written sent him, it does say the appointing authority for better or for worse. That's what it says. And it was and it was given on October 6th and September 14th. OK, you know, and I don't want to we've taken you over. I wonder if we should give you some time for rebuttal and I want to go look at these declarations because I don't think they're as clear as you're representing them, that he talked to his supervisor about reassignment. That's I think that's a very important key point I want during the break. I'd like you to come up with the declaration and cite me that specific statement where he talked to his supervisor about reassignment. That's what I want to do, because I see that that is going to be a quintessential issue. OK, I'm sorry if I came across as no, no, no. I mean, look, it just we're trying to nail this down. And I think we're not getting the answer that Go ahead. Good morning, Your Honor. Kevin Kennedy, special assistant attorney general for the appellee. As three court of appeals have held where an employer offers a reasonable reassignment process and an employee without good reason fails to participate in that process, the employer is entitled to judgment on the title seven claims. That's precisely what happened. And that's what the district court said. So let's get into where we just got kind of the trains wrecking on the on the on the on the railroad here. He claims that he there's two there's a policy, a written policy that gave different advice than the letter. I don't think he has disputed that he got a letter that said go to H.R. But the policy said reasonable accommodation is handled by your supervisor. Why isn't that a problem? A few reasons, Your Honor. First, I don't see that argument in Luxton's briefs before this court. He doesn't quote any policy directing him to his supervisor of supervising authority to to deal with accommodations. So to that extent, the argument seems to be forfeited. Furthermore, the letter is crystal clear. The one that he did receive, the one that we quote in our brief and the one that's in the record. And it says this is the reassignment process. Your reassignment, your H.R. representative is Ashley Drescher. Email her within a week. Send your resume to express interest in reassignment and we'll look for reassignment positions with you. Dr. Luxton did respond to that email, but not to request reassignment. He asked a variety of other unrelated questions about the accommodation process. Is it possible that he was confused between the difference for between accommodation and reassignment? The the letter is quite clear on this. It says that the only accommodation that the department has found was it would be a reasonable accommodation after we've heard lots of cases. It's easy for us to divide between. Qualification for the exemption. And determination of whether your current position can be fit with that exemption and the possibility of being moved to a different position. It's not so clear that that was on the table as a given for everybody at the time. I look at the discussion and I have some of the same questions that Judge Nelson has raised, but I also have, you know, if you've got a conversation going on. He he makes clear his desire to stay with the department. He may not have pursued the specific reassignment to a different position route in the way the letter spelled out, but the department is capable of communicating internally as well. And so it it it does get a little murky in terms of what he's thinking about and how he's trying to pursue it. So it would seem harsh to erect a rule and I recognize that some courts appear to have adopted it that says follow this to the letter of the letter or else when in fact there is some degree of ongoing dialogue. Why is it we should erect such a strict wall that if you don't actually follow the path laid out here, you're out? A few reasons, Your Honor. First, the the letter is quite clear on what the next steps would be and Luxton indisputably did not follow those clear directions. Well, that's for reassignment to a different position. He was still making the contention he could do his existing position and we didn't want to abandon that proposition. So is he supposed to take two different paths at the same time? Understandably, in retrospect, the answer is probably yes. Was that evident at the time in question? I mean, part of the problem, we're all trying to send our minds back to what it was like five years ago. Times of uncertainty. Is it really so unreasonable for an employee to think that, well, I'm trying to talk my way back into my or explain why my current position should be available, but I'm willing to take plan B if that's what is all that's available. All of the accommodations for staying in his current position as the department has demonstrated would have imposed an undue hardship on the department. And so we have our two separate affirmative defenses here. There's the offer of a reasonable reassignment process and there's separately the affirmative defense that accommodating him in his position would have represented an undue hardship on the department. If we if we conclude that the district court was correct in concluding that it would impose an undue hardship on the agency, do we need to get to reasonable accommodation? No, Your Honor, because the only accommodations that Luxton really saw were accommodations in his job, telework, masking, distancing. And the department has demonstrated that all of those accommodations that he thought would have imposed an undue hardship on the department in Luxton's title. Luxton's title was the director of counseling and wellness services as the as the as the description of his job made clear, as well as Director Puente's declaration. It was a core function of that job to provide oversight of the contractor's facilities throughout the state that required site visits to do to supervise those contractor facilities. He had to walk up and down the ramps. He had to go into providers rooms that would put him in direct contact with the department's vulnerable clientele, the veterans. Wait, why would it have? Why would that have put him in contact with the veterans? I mean, so the other cases that we have are like firefighter cases or, you know, doctor cases. This one does seem different. Now, I'm not saying you can't win on undue burden, but I'm not sure Peterson and Williams and some of these and, you know, other cases control it because it does seem like his position was more of a background. Now, he might have had contact with the employees, but you say, oh, well, he would have been in contact with the with the vulnerable patients. I don't see why that's necessarily true. None of his job responsibilities included talking to the patients or interacting with the patients. Um, with I would I would take one exception to that. There was, as Director Puente describes, part of his his responsibilities were providing bereavement services in the veterans homes in the case of a death by a veteran. And in that capacity, he had to be there. He had to be there. He had to be in every bereavement. It's not appropriate to provide bereavement services through through a computer screen. Was the was the department's reasonable? He was the director. The director had to be at every bereavement service or he had staff that he had to direct on who could be there. I mean, the record in this case indicates that he had to be at the bereavement services. Furthermore, his core function was providing oversight over the contractor facilities. And again, the record on this is quite clear that the primary way and the only way it could be adequately performed was by going to these contractor. But that's a different question. You everybody now is trying to shoehorn everything in and say this is an undue burden because we had contact with with vulnerable individuals. I'm pushing back on that because I don't think that the record supports that here. And and now the record does support what you said, which is you're supposed to go to the facilities. But I'm not sure that just because you have to have an insight visit to to to check on a facility. That that is the same thing as these other cases that we've heard where you have to have contact with individuals. I direct your honor to to four ER eight sixty one to sixty six of the excerpts of record, which is Director Puente's declaration, which describes why and how Dr. Luxton's job responsibilities put him in direct and indirect contact with the department's vulnerable clientele, the veterans in in health care facilities. I mean, and I'll just provide some color for that. You can imagine to make sure that the facilities are providing adequate services, you would need to go into those facilities, into the waiting rooms, into the provider rooms. And in that capacity, you would be in direct contact with veterans, with their families, with other service providers. And so that clearly demonstrates that the job entailed substantial contact with vulnerable populations. And the other and the question, the legal question that the of Peterson and Williams is that where there is a realistic risk of increased COVID-19 health and safety costs, that that readily satisfies the undue burden standard. And here we have the in-person contacts for the reason that I've just described and the evidence that COVID-19 was the vaccine was effective. Indeed, the most effective remedy and that the veterans are a particularly vulnerable population. They have significant comorbidities and face serious risks due to generally being an older population. And indeed, this was borne out between October 2020, between February 2020 and October 2021, 35 veterans died in departments facilities. So in that context, the department was was entirely reasonable in determining that. The problem with your argument here is that your argument is basically the the model for why no religious exemption ever had to be granted. And that that is a problem because I don't see our case law going that way. Respectfully, Your Honor, I disagree. There is, of course, a line where a person's job does not have significant enough in-person responsibilities, not enough contacts with vulnerable populations. But this is not your case. He had no duty. Any any contact with these populations was incidental. It was not required by his job. It was not. His job was not to treat patients, but his job, his and sort of unavoidably indirect contact. He couldn't have visited during, you know, off hours. He couldn't have worn a mask when he went in. He couldn't have socially distanced for six feet. I mean, we are on a very slippery slope here. And the position that you're taking is. If there's any chance that he would have come in contact with a vulnerable person. I mean, I could come into contact with a vulnerable person walking into a grocery store you understand that, Your Honor, but your job is not to go into contractor facilities, health care facilities and to inspect the level of care being provided. His job was to supervise these health care providers and make sure that they were providing adequate care to veterans. That is a health care position. He it was a core feature of his job that he was going into these facilities and having direct contact with veterans. It's not some incidental contact contact unforeseen. And so to the extent that the court is concerned about drawing a line, I think it can draw the line safely beyond this case, because here it was a health care position that required going into health care facilities and having direct contact with a vulnerable. Can you give me the you cited to four E.R. What was it? 861 to 66. I know that's a bit of a range. The no point you made is 863. Thank you, Your Honor. We live to serve. Let me ask you. As you heard on Wednesday, we were dealing with lots of different state departments for some of them. We had statistics on the number of accommodations that could be made and the accommodation request for accommodations that were denied. Do we have any information with regard to this department? Yes, Your Honor. There were 78 total accommodation requests and no accommodations were provided. But I take your honor to be asking about that in the context of the reassignment process. Well, yeah, because I mean, I got to believe every department has back office operations. Somebody's doing the finances and wouldn't have contact and so forth. And I got two different paths here, so let me try to keep them separate. The fact that there were no accommodations granted does raise some concern as to whether the department applied too strict a standard. Were there no requests from people who actually were in the accounting department and didn't actually go out and deal with patients? So the record doesn't, I think, show one way or another on that question. With respect to undue hardship, I think, you know, it's an individualized inquiry. And with respect to Dr. Luxton, for all the reasons, I won't belabor them again, we think that the department has readily satisfied the showing here. With respect to the reassignment process, I don't think it gives any reason to doubt the efficacy of the reassignment process because there's no evidence that of those 78, how many were offered reassignment as an option. There's no evidence that, you know, of the ones that were offered, how many pursued the Luxton route and decided to short circuit the process and how many actually went through and applied for available positions. So it really doesn't sort of show one way or another whether the process was reasonable. And... So can I ask you about that? Because I think, I mean, we're going to hear on rebuttal and I want to hear his response, but I don't think that there was a request even to Dressler about reassignment. I'll be interested to hear what he comes up with. But his testimony was that he didn't ask about reassignment. That's correct. The deposition test. But there is a separate question about futility and Dressler does testify granted a year later that said the department did not identify any positions at or below that pay range for which Mr. Luxton was paid at and which he qualified for that would allow for reassignment and allow for unvaccinated status. Why doesn't that create an issue that this would have been a futile endeavor? You know, so what we're doing is we're putting forward this, you know, procedural requirement, email, when we kind of all know what the end result was going to be. He was at a high enough level, this wasn't going to work. Why isn't that a response to this? On that specific evidence, that evidence as the district court, I think quite rightly explained, it was a decontextualized excerpt of a transcript that we don't have. We don't even know in what context Dressler was making that statement. I thought she testified to that. She testified to that, but in what sort of hearing, we're not sure. We don't know whether what she's referring to exactly. Is it about the potentially available positions at the time that Luxton was terminated and didn't seek reassignment or was it in a later context of him seeking, filing an unemployment claim? So on that score, I don't think that evidence really goes one way or another. More broadly to your point, the record doesn't show whether there were available positions because Luxton himself did not seek out and try and figure out whether there were available positions. I give you that. So there's two routes we could go. Well, the route we could go is, as you're advocating, he didn't ask, end of story. Okay, maybe. But we also create exceptions in other contexts for that requirement, for prisoners, for all of these others, where we say, yeah, but if it was futile, then we're not going to require you to do that. And there is some suggestion in the record that that was really not a viable option. And so why wouldn't we, why, I mean, I'm a little bit worried about the unintended consequences of adopting a rule like you say, because there is some evidence here that makes it a little bit murky. The department's position is the rule should be this, where the employer offers a good faith reassignment process and the employer, the employee without good reason fails to participate in that process, then the employee's claim fails. There are two sort of exceptions built into that standard. There's the good faith exception. So if there's reason to believe that the employee's employer's process was not offered in good faith, then I think there's a reason to send it to the jury or something else there. And then if the employee had good reason for not participating in the process, again, it's not a clear judgment in favor of the employer. Neither of those are the case here. There's, Your Honor, you've referenced evidence in the record indicating that this was futile. That record, that evidence simply is not there. Well, he does, he does say, I think this is his declaration. He said, I specifically asked, this is it, 2 ER 239. He says, I specifically asked COL Forbes, now not his supervisor, I'm not sure where Forbes fits into it, about my reassignment options and how I could exercise them when I met with her on October 5th, 2024. So that's much later, I guess. That is confusing to me. She advised that the decision had already been made and there was nothing that could be done. I wonder if that's a wrong date. That wouldn't make sense that the 2024. I'm not sure, Your Honor. And we can double check that. And are you aware of this? I guess. I'm aware of the declaration testimony, but again, he knew that that Forbes had nothing to do with reassignment. What she's not saying is that there's no reason. But Forbes didn't say I have nothing to do with. She said there's nothing she can do. No, according to the declaration that the decision had, well, that the decision had already been made and there was nothing that could be done. I guess that's open to interpretation. Has anybody identified it? And part of what I'm fighting through here, I hypothesize, you know, there's going to be an account in someplace that works in the back office. He's not an account. He's a psychologist. Was there any attention? And maybe this is where his direct supervisor can speak. In terms of somebody who is a psychologist and whose field will be counseling and inpatient wellness. Is it just the problem, not that maybe there's another job in the department that somebody could do remotely, but this skill set, which seeks who is a psychologist and is a counselor and supervising, that's the position that we don't know how to accommodate because patient contact is inherent in the position. Do we have any, the record, as it turns out, doesn't speak to some of these questions. Is there anything that speaks at all to that? I, each accommodation, each reassignment question is an individualized process based on the employee's particular qualifications and their fit for a particular role. And so to that extent, you know, there's really no evidence indicating that if Luxton had gone through the process, we don't know which way it would have gone. And I think where the employer has provided what is a good faith process, the onus shifts under this court's cases where the employer has provided initiated good faith efforts to accommodate an employee, that triggers the employee's concomitant duty to cooperate in good faith. And here Luxton did not do that. Asking his supervisor who didn't have, he was not on the letter with the clear instructions about reassignment. It's not cooperation. Or it's a supervisor? That's my understanding. Okay. Well, I thought Dreschler was the supervisor. Dreschler is the HR representative. Oh, okay. I got it. I got it. Okay. Well, this is interesting because this says he did. Okay. So this is a declaration where he said he did ask a supervisor about reassignment, which is interesting because that's different than his testimony under oath. So again, there is a clear conflict between his deposition testimony. And this is what the district court found, is that the deposition testimony makes quite clear that Luxton never requested reassignment from his supervisor. When asked in his deposition whether he requested reassignment, he said he asked for any accommodation. And then in the deposition testimony, when followed up and said, okay, what specific accommodations did you request? He listed numerous accommodations, telework, masking, distancing. He never once mentioned reassignment. So his later attempt as a district court found to contradict that earlier deposition testimony in an effort to create a genuine dispute of fact for summary judgment can't control. There's no genuine dispute of fact under this court's cases like Kennedy. And the district court made that sham affidavit finding. So. Okay. Thank you, your honors. We've let you go over. Thank you. You get paid overtime for this? Uh, no. We'll give you two minutes for rebuttal. Okay. So I think we've started to crystallize the question because you're citing to his declaration where his declaration says, I asked Forbes, the supervisor about reassignment. Supervisor and appointing authority. Okay. Okay. But then go back to 92 ER 93 and the deposition testimony and your client said, no, I never asked about reassignment. Doesn't say that you just didn't specifically address it. He said he talked about accommodations, but it was reassignment is an accommodation. I mean. Hold on. I want to read it again because, um, sorry. So you think that the deposition testimony is not inconsistent with the declaration? There was also in his original declaration that he filed, um, in support of a summary judgment. He said, I discussed accommodations, including reassignment and the court accepted that declaration. So we don't even have to go beyond that. Um, but then he didn't accept the second declaration where he said, I specifically asked about reassignment because then I guess that crossed the Rubicon. Do you ever identify a position to which he could be reassigned consistent with the limitations he thought should be imposed? I did not your honor. And that's the point I wanted to address. It's called burden of proof because the burden of proof under Ansonia, which is where we created this exception to having to prove to the Supreme court created the exception to having to prove undue hardship. And it says you have to offer a reasonable accommodation, reasonable accommodation eliminates the religious conflicts and preserves, uh, preserves the status. They didn't offer an accommodation. Did he be an accountant, which could work in the back office? I mean, I'm having trouble figuring out given his qualifications and skillset, what is it that he could do remotely entirely? I'm, I'm glad you asked that question because it says in his job description, his written job description says office back office, not your office environment. And it's also says site visit also says, and it also says up to 100% telework up to, up to, but, and during the time of COVID, we were all doing a hundred percent, but that doesn't mean at a time when they can try to put people in contact with each other, they shouldn't try to do it, but this is his overall job description. Okay. And it says it can be done up to 100% up to, up to is not the same as equals 100%. And that description says site visit. You haven't denied that, but you didn't deny it. So how can I accept the proposition that he can do the job he wants entirely remotely? Because up to means that a hundred percent telework is a possibility. And during the height of the pandemic, it was, but when you're past that point, why is it the department is required to accept somebody whose job description clearly anticipates travel. It says travel's required. You go to all these facilities, you make site visits. Well, during the height of the pandemic, we're all staying home. They had to accommodate for that. But once, you know, shoots of green start poking up through the burned out forest, and we've got ways to try to get people back in touch with doing the things that we want those people to do, why is it? And what position is there for somebody with this skill set that can be entirely by telework? You haven't identified such a position. I have difficulty imagining such a position. Your honor. Again, this was not the job description for COVID. This was the overall job description that says up to now. I agree. It doesn't say 100%. You work remotely all the time. It doesn't say that. Right. But we know that it was ordered to be 100% remote since March of 2020, all the way through August 9th of 2021. And so they had operated for, you know, a year and a half plus with no site visits, with no travel. And we're all talking about an accommodation, which is an alteration to essential functions of the job to accommodate somebody's religious belief. And we and that is what he was asking for is just the accommodation to see what panned out. Now, in hindsight, we know that that ended in October 2022, less than a year later. Right. And he could have got they could have won another year. Can I ask about this bereavement? There is this testimony that he needed to go into the family's homes or a declaration that he needed to go into the family's homes when there was with the family. It doesn't talk about location. Oh, I guess that's right. So it could have been. I'd have to go back. So is it? Yeah. Was that at the facility? Did he have to meet with them? Was he the only person who could do that? Absolutely not. Your honor, you hit it right on the head. Was he and go to Spokane one day and he's going to go to, you know, Richland the next day and he's going to know he's a remote facility don't die every day. They they had thirty five or thirty nine deaths over a period of longer than a year. That was a lot of people dying at the same time in two cities. That was from covid. Well, that's what we're talking about dying veterans homes. Right. Like my client's mother. Well, how did they handle that during covid? It's in the job description, your honor. He's got a case, manager. He's got these level fives. He's got these level fours. He's got these level threes, all of whom he supervises and he states and they could have they could have attended one of these. They did. They had crisis counselors at the sites. He testifies to that in his declaration. He goes, I ever since he left the armed forces and he went into civilian, he worked for the Navy. He is not in the beginning of his career. He provided some counseling to veterans. He designed the telehealth program. He's not the counselor that provides direct care. That's not as he has the credentials as a bureaucrat. I understand all that. I'm just I'm I hadn't focused before on this bereavement part. So I was trying to I think you've given me the answer. And it's not in his job description. It's not in his performance development plan. It's nowhere to be found except in Director Pointe's declaration. And Dr. Luxton disputes that he's not the person who should be providing direct care for bereavement or otherwise. OK, that's not it. That's not his forte. Any other questions? Yeah. Yeah. I think I think we've hit the time and we appreciate everything that you've done to help us with. The only thing I'd like to make sure you OK, just 32 dash three in the in the in the trial court record is the policy where it's where it talks about the appointing authority. It talks about the supervisor, that they make the ultimate decision and HR makes recommendations to them. OK, no, look, I think we know what we're we're looking at. So we thank you for your time. And the case is now submitted. Both counsel have helped us out. I want to thank you. And I'm sorry for your law clerks, because I have a funny feeling they're going to have some more work to do on this. But thank you very much for your time and attention and great to do. All right. Thank you.
judges: HAWKINS, CLIFTON, NELSON